**In re CARR MILL MALL LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 93–112158C–11D.**

United States Bankruptcy Court,
M.D. North Carolina,
Durham Division.

Oct. 11, 1996.

---

Ashley H. Story, Story & Wyche, Raleigh, NC, for Debtor.

Thomas B. Henson, Robinson, Bradshaw & Hinson, Charlotte, NC, for Dr. and Mrs. John W. French.

Douglas R. Ghidina, Moore & VanAllen, Raleigh, NC, for Massachusetts Mutual Life Insurance Company.

### ORDER

CATHARINE R. CARRUTHERS, Bankruptcy Judge.

This matter came before the court after due and proper notice on September 19, 1996, on Massachusetts Mutual Life Insurance Company's Motion for Determination of Allowed Amount of Senior Secured Debt as of Debtor's Refinancing and the Objections to said Motion filed by Dr. and Mrs. John French and Carr Mill Mall Limited Partnership. Douglas R. Ghidina appeared as counsel for Massachusetts Mutual Life Insurance Company; Thomas B. Henson appeared as counsel for Dr. and Mrs. John W. French; and Ashley H. Story appeared as counsel for Carr Mill Mall Limited Partnership.

This matter constitutes a core proceeding over which this court has jurisdiction. *See* 28 U.S.C. §§ 157(b)(2)(A) and Standing Order No. 10 of the United States District Court for the Middle District of North Carolina.

Having considered the evidence offered by the parties, the arguments of counsel, the legal authorities cited, and upon a review of the entire official file, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1) On January 31, 1996, Carr Mill Mall Limited Partnership (hereinafter "the Debtor") filed a voluntary petition under Chapter 11 of Bankruptcy Code. The principal asset of the Debtor was a shopping center located in Carrboro, North Carolina.

2) Massachusetts Mutual Life Insurance Company (hereinafter "MassMutual"), the successor in interest to Connecticut Mutual Life Insurance Company, was a secured creditor of the Debtor, holding a senior lien on the Debtor's principal asset, the Carr Mill Mall (hereinafter "the Mall"). At the time of the filing of this bankruptcy case, MassMutual held three notes and deeds of trust encumbering the Mall. On February 16, 1978, the then-owner of the Mall, Carr Mill (an entity different from the Debtor), executed a promissory note (hereinafter "the First Note") in the original principal amount of $2,000,000 in favor of MassMutual. The note was secured by a deed of trust encumbering the Mall. On October 23, 1979, Carr Mill executed a second promissory note (hereinafter "the Second Note") in favor of MassMutual in the original principal amount of $500,000. This note was also secured by a deed of trust encumbering the Mall. On March 28, 1985, Dr. and Mrs. John French (hereinafter "the Frenches") executed a promissory note (hereinafter "the Third Note") in the original principal amount of $900,000 in favor of MassMutual. This note was also secured by a deed of trust in favor of MassMutual and encumbering the Mall. Each of the deeds of trust securing the above notes were recorded in a timely fashion in the Office of the Register of Deeds of Orange County, North Carolina. As of the petition date, the total principal balance due MassMutual under the three Notes was approximately $1,649,843.30.

3) By their express terms the First Note and the Second Note each matured on March 1, 1993. The Third Note matured on April 1, 1993. Thus, all three of the notes held by MassMutual matured prior to the filing of this bankruptcy.

4) Each of the three notes permitted the obligor to prepay the outstanding principal before the applicable maturity date subject to certain penalties and restrictions. The First note provides:

The maker shall have the privilege of making additional principal payments on interest dates, not exceeding 10% of the original principal amount, including required payments, in any one loan year, non-cumulative; after ten years, full payment can be made on any interest date upon payment of a premium of 3% of the then unpaid balance and with sixty days prior written notice; said privileges not to be exercised simultaneously.

The Second Note provides:

The maker shall have the privilege of making additional principal payments on interest dates, not exceeding 10% of the original principal amount, including required payments, in any one loan year, non-cumulative; after ten years, full payment can be made on any interest date upon payment of a premium of 4% of the then unpaid balance if paid during the 11th loan year and diminishing ½ of 1% for each succeeding full loan year to 2%, and thereafter without further decrease, provided the holder hereof shall have received at least 60 days' prior written notice of full prepayment. These privileges may not both be exercised during the same twelve month period.

The Third Note provides:

Maker shall have no right to prepay this loan, whether in full or in part prior to April 1, 1990. On the first day of any month after April 1, 1990, upon thirty (30 days prior written notice to the holder hereof, and provided the obligations under [the previous loans] have been satisfied in

full, the privilege is reserved of prepaying this note in full, together with a premium designed to compensate the holder for reinvestment loss if any such prepayment is made at a time when the Reinvestment Yield is lower than 14.4%.... If the Reinvestment Yield is greater than 14.4%, no prepayment premium shall be due.

The Third Note goes on to define the Reinvestment Yield as "the yield, as quoted by the Federal Reserve Bank of New York City on the Yield Date, of that certain U.S. Treasury Note issued February 15, 1983, with a coupon interest rate of 10.78%, maturing on February 15, 1993."

5) In August of 1989 the Frenches sold the Mall to the Debtor. In connection with this purchase, the Debtor executed a purchase money wrap-around promissory note in favor of the Frenches, dated August 17, 1989, in the original principal amount of $5,900,000. The "Wrap Note" was secured by a deed of trust encumbering the Mall and matured on March 1, 1993. The original principal amount under the Wrap Note included approximately $2,335,000 in principal then owed by the Frenches to MassMutual pursuant to the three notes and senior deeds of trust held by MassMutual.

6) The Debtor proved unable to make the March 1, 1993 balloon payment under the Wrap Note. Subsequently, on April 16, 1993, the Debtor filed a voluntary Chapter 11 proceeding to fend off a pending foreclosure proceeding instituted by the Frenches. During the Chapter 11 proceeding, the Debtor made all required adequate protection payments to MassMutual and the Frenches.

7) The Debtor was able to work out a consensual plan of reorganization (hereinafter "the Plan") and on October 11, 1994, the Debtor's Plan was confirmed by the court (the Honorable Jerry Tart presiding). As of the effective date of the Plan MassMutual was owed approximately $1,649,843 in principal under the three senior notes. As of this same date, the Debtor owed approximately $5,750,000 to the Frenches under the Wrap Note, inclusive of the amounts due MassMutual.

8) Under the terms of the Plan the Debtor's obligations to MassMutual and the Frenches were restructured by extending the payoff date of the three senior loans to November 1, 2001, seven years after the effective date of the Plan. While the monthly payments under the three senior notes were adjusted, the interests rates for the three notes remained unchanged; MassMutual would continue to collect interest at a rate of 9.25% on the First Note, 10.125% on the Second Note, and 14.4% on the Third Note, as provided in the original loan documents. Testimony elicited at the hearing in this matter established that each of these interest rates was above the prevailing market rate applicable at the time of the plan confirmation.

9) The Plan treatment of MassMutual, found in Article VII, Paragraph 7.3, provides that the Class 1 claim of MassMutual "shall continue to be secured by any lien or security interest in any collateral to the same extent as such claims were secured on the Filing Date." The Plan treatment goes on to state:

> Except as expressly modified by the terms and conditions of this Plan or any other order of the Bankruptcy Court, all terms and conditions of the [MassMutual] Loan Documents shall remain unaltered and in full force and effect.

10) Pursuant to Article XXI, Paragraph 21.5, of the Plan, entry of the Order confirming this Plan was deemed to be an entry of an Order reinstating the obligations owed by the Debtor to MassMutual (and the Frenches) *as such obligations existed on the date immediately preceding the bankruptcy filing.* (Emphasis added).

11) On December 29, 1994, the Debtor and MassMutual entered into three Modification and Estoppel Agreements to memorialize the modifications to MassMutual's original loan documents implemented by the Plan as to the First and Second Notes. A third Modification and Estoppel Agreement was executed on May 15, 1995, to memorialize the modifications as to the Third Note. The three Modification and Estoppel Agreements did not contain any mention of the prepayment penalties contained within the original Notes. However, consistent with Paragraph 7.3(g) of the Plan, each of the Modification and Estop-

pel Agreements expressly provided that, except as expressly modified, all other terms and conditions of the original loan documents remained unaltered and in full force and effect. The Frenches were not signatories to the Modification and Estoppel Agreements.

12) A final report was filed with the court on August 22, 1995, and a Final Decree closing the case was entered on August 31, 1995.

13) In December 1995, the Debtor informed MassMutual that it had located a prospect for providing viable refinancing and requested payoff statements on the three Notes. MassMutual, in turn, provided the Debtor with a letter stating the payoff of each note, including a prepayment premium for each note, as well as post-confirmation attorneys' fees and late charges. According to the payoff letter, if the Debtor desired to refinance, it would be obligated to pay prepayment penalties on the First Note, Second Note, and Third Note in the amounts of $13,680.53, $5,220.70 and $367,839.62, respectively. In percentage terms, these prepayment amounts are 3%, 2%, and 44.8% of the principal amounts due under the Notes. Notwithstanding what it claims it is owed, MassMutual has indicated it will accept a $214,984.39 (26.2%) prepayment penalty on the Third Note.[1]

14) Throughout the negotiations of the Plan the Debtor envisioned that it would refinance its debt with MassMutual before the maturity of the renewed loans in November 2001. Brian Hoffman, a limited partner of the Debtor, testified that all parties, including MassMutual, understood that the purpose of the Plan was to buy the Debtor time while it obtained refinancing from an outside source. Terrance Doyle, the Frenches' California counsel, recounted these same facts. Although the court finds the testimony of both these gentlemen to be relatively credible, the court finds that although MassMutual may have had some reason to believe that the Debtor was seeking to refinance its

debt, it did not understand that the *sole* purpose of the Plan was to buy the Debtor time to refinance. To the contrary, MassMutual relied on statements contained in the Plan that the Debtor would implement the Plan by continuing to operate the Mall and thereby produce cash flow sufficient to pay all allowed secured claims. (*See* First Modification to Second Amended Plan of Reorganization of Carr Mill Mall Limited Partnership ¶¶ 3.1 and 19.1).

15) The court finds that the possibility that the Debtor or the Frenches would be obligated to pay prepayment penalties in the event the renewed loans were paid off prior to November 2001 was never discussed by any of the parties. Although Charles Chamberlain, an investment director with Mass-Mutual, testified that he assumed that the prepayment provisions would remain viable post-confirmation and that a brief he prepared as a part of workout process memorialized his belief that MassMutual would continue to enjoy those rights, Mr. Chamberlain did not have his brief available at the hearing in this matter for the court to review. Further, Mr. Chamberlain never participated in any Plan negotiations or communicated his "understanding" that MassMutual would be entitled to the prepayment penalties to the Debtor, the Frenches, or their respective counsel. Considering the peculiar circumstances of this case, the court does not believe that the issue of the prepayment provisions continuing post-petition was an issue that was ever contemplated by *any* party in this case until well after the Plan had been confirmed and the Modification and Estoppel Agreements executed.

16) In February 1996, the Debtor successfully obtained a refinancing commitment from a third-party lender. Although the Debtor objected to the prepayment penalties and certain other charges and fees requested by MassMutual, the parties agreed to escrow the amount in dispute, $239,093.65,[2] to pre-

---

1. In calculating the prepayment premium due under the Third Note, MassMutual has substituted the yield on a Treasury Note maturing in November 2001 (the maturity date of the renewed Third Note) for the yield specifically called for in the in the prepayment provision of

the Third Note (the yield on U.S. Treasury Note maturing on February 15, 1993).

2. The total prepayment penalty amount of $239,-093.65 represents $13,680.53 in prepayment penalties on the First Note, $5,220.70 in prepay-

vent the collapse of the Debtor's refinancing arrangement.

17) All creditors of the Debtor have been paid. It is undisputed that the funds in escrow will not be released to the Debtor but will be awarded to either the Frenches or MassMutual.

18) Because the Debtor's bankruptcy case had been closed by a Final Decree entered on August 30, 1995, MassMutual, the Debtor and the Frenches joined in a motion to reopen the case so that the court could exercise jurisdiction over this dispute. Pursuant to an Order entered July 11, 1996, this court reopened the Debtor's bankruptcy case to hear and resolve this issue of whether MassMutual is entitled to the above prepayment penalties.

## CONCLUSIONS OF LAW

The issue presently before the court is whether MassMutual is entitled to collect prepayment penalties on loans which matured prior to bankruptcy but have been extended by means of a Chapter 11 plan of reorganization when the plan itself contains no mention of any prepayment penalties.

The court notes at the outset that this appears to be a case of first impression; the court's research has failed to uncover any case law, bankruptcy or otherwise, which dictates a specific resolution to this case.

■■■ Generally speaking, if the loan documents memorializing a debt so provide, and applicable non-bankruptcy law does not dictate otherwise,[3] an oversecured creditor is entitled to collect prepayment penalties in the bankruptcy context. *In re LHD Realty Co.*, 726 F.2d 327 (7th Cir.1984); *Continental Securities Co. v. Shenandoah Nursing Home Partnership*, 193 B.R. 769, 775 (W.D.Va.

1996); *In re Duralite Truck Body & Container Co.*, 153 B.R. 708, 713 (Bankr.Md. 1993); *In re Financial Center Assocs. of East Meadow*, 140 B.R. 829 (Bankr.E.D.N.Y. 1992). Authority for the allowance of prepayment penalties under the Bankruptcy Code can be found in 11 U.S.C. § 506(b). Under that Code Section, oversecured creditors are permitted to collect the amount of any "reasonable" charge as a part of their allowed secured claim. 11 U.S.C. § 506(b).

■■■ While there may be a question as to whether the prepayment premiums in the instant case are "reasonable," a more basic issue which must first be addressed is whether MassMutual is entitled to collect *any* prepayment premium.

The Debtor and the Frenches contend that MassMutual is not entitled to collect any prepayment penalties. In support of this argument they point out that the Notes matured in March and April of 1993, and payment of the Notes in February 1996 does not constitute prepayment. As stated by the Frenches, "[p]repayment is an obvious and necessary condition to the enforcement of prepayment penalties." Frenches' Memorandum p. 7. The Frenches also claim that the Plan and Loan Modification Agreements intended to, and did, exclude prepayment penalties from the amounts to be paid MassMutual. The Frenches cite § 16.10 of the Plan to support their contention in this regard. That section of the Plan provides, in relevant part, as follows:

> [N]either this Plan nor its confirmation affects the liability of any other entity on, or the property of any other entity for, any Claim treated by the Plan....

The Frenches assert that under this provision of the Plan, they cannot be held liable

ment penalties on the Second Note, $214,984.39, $263 in late charges and $4,945 in post-petition attorneys' fees.

**3.** In North Carolina prepayment provisions are valid and enforceable. Although the North Carolina legislature has limited the amount of lawful prepayment premiums in some circumstances, the North Carolina General Statutes make clear that in the context of a commercial real estate loan in excess of $100,000, the parties may agree

upon *any* prepayment terms whatsoever. N.C.Gen.Stat. 24–10. As stated by Chief Judge Fox of the Eastern District of North Carolina, the wisdom of the statute is manifest: "the statute preserves freedom of contract, a principle long recognized and jealously guarded in North Carolina.... The [statute] recognizes that prepayment provisions are part and parcel of the overall loan terms and, as such, are better left to the agreement of the parties." *West Raleigh Group v. Massachusetts Mutual.*, 809 F.Supp. 384, 389 (E.D.N.C.1992).

for prepayment penalties after the confirmation of the Plan if they were not liable for them prior to the confirmation of the Plan. Again, the Frenches believe they were not liable for prepayment penalties prior to the confirmation of the Plan because the Notes had already naturally matured. As further support for their contention that the Plan did not intend to include the possibility that the they might be forced to incur monetary penalties in the event of prepayment, the Frenches note that the underlying purpose of the prepayment penalties had been fulfilled upon the natural maturation of the Notes. As all parties acknowledge, the underlying purpose for the inclusion of prepayment penalties in any loan document is to protect lenders from the possibility that market rates will fall and the inability to reloan prepaid funds at an interest rate at least as high as the rates provided in the notes. According to the Frenches, MassMutual already received the benefit of its bargain because the Notes were not prepaid prior to their natural maturity date. As stated by the Frenches,

> The prepayment penalties contained in the Notes worked. MassMutual made its loans under the First Note, Second Note and Third Note at non-default interest rates of 9.25%, 10.125% and 14.4% respectively. Although the market rates fell, the Frenches did not refinance at lower rates [prior to bankruptcy] because of the prepayment penalty provisions in the Notes. As a result, MassMutual collected interest at substantially above-market rates throughout the original term of the Notes.

Frenches' Memorandum p. 7. Lastly, in addition to denying that the Modification and Estoppel Agreements affect their liability to MassMutual, the Frenches argue that, irrespective of timing, the prepayment penalties should not be enforced in this case because (1) all the premiums are "unreasonable" under 11 U.S.C. § 506(b); and (2) with regard to the Third Note, the prepayment penalty is unenforceable because the amount of the premium cannot be calculated without modifying the terms of the prepayment provision inasmuch as the provision references a U.S. Treasury Note which has already matured.

MassMutual, of course, argues that the prepayment premiums are enforceable. It bottoms its argument on the simple fact that both the Plan and the Modification and Estoppel Agreements state that any provision in the loan documents which is not expressly modified by the Plan or Modification Agreements remains unchanged and in full force and effect. Because neither the Plan nor the Modification and Estoppel Agreement expressly alter the prepayment provisions, MassMutual believes it is entitled to collect those premiums.

Although strong arguments can be made both for and against the enforceability of the prepayment provisions in each of the three Notes, for the reasons outlined below, the court concludes that the prepayment provisions are unenforceable in this case.[4]

 As a starting point the court notes that the Plan and subsequent Modification and Estoppel Agreements are ambiguous. On the one hand, the Plan and Modification Agreements state that those provisions of the Notes which are unaltered remain in full force and effect. On the other hand, the Plan, in paragraph 21.5, provides that "[e]ntry of an Order confirming this Plan shall be deemed to be entry of an Order reinstating the obligations owed by the Debtor to [MassMutual] and the Frenches as such obligations existed on the date immediately preceding the Filing Date...." Additionally, paragraph 7.3 of the Plan states that claims of MassMutual "shall continue to be secured by any lien or security interest in any collateral to the same extent as such Claims were secured on the Filing Date." Therefore, to the extent that the Plan and Modification Agreements retain all unaltered terms, including the prepayment provisions, and also return the parties to their post-maturity/pre-bankruptcy status, a period when the prepay-

---

**4.** Because the court holds that the prepayment penalties are unenforceable *en toto,* the issue of whether the amount of the penalties are "reasonable" under 11 U.S.C. § 506(b) is moot and will not be addressed.

ment provisions could not possibly have been enforced, the Plan is ambiguous.[5]

Because the Plan and the Modification Agreements are ambiguous as to the post-confirmation effect of the Notes' prepayment provisions, it is incumbent upon the court to discern how the Plan as a whole envisions the Debtor's reorganization and how that reorganization would be affected by the enforcement of the prepayment penalties.

When interpreting a plan of reorganization, a court must apply state contractual principles to construe its terms. *In re Texas Gen. Petroleum Co.*, 52 F.3d 1330, 1335 (5th Cir.1995); *In re Buckhead America Co.*, 180 B.R. 83, 89 n. 9 (D.Del.1995); *In re UNR Industries Inc.*, 176 B.R. 472, 474 (N.D.Ill. 1994); *In re Doty*, 129 B.R. 571 (Bankr. N.D.Ind.1991). In North Carolina, as in most states, the parties' intent is the lodestar of contractual interpretation. *Pike v. Wachovia Bank & Trust Co.*, 274 N.C. 1, 161 S.E.2d 453, 462 (1968) ("The heart of a contract is the intention of the parties ..."). When the terms of a contract are ambiguous, parol evidence is admissible to determine the intentions of the parties as to the meaning and effect of a contract. *IRT Property Co. v. Papagayo Inc.*, 112 N.C.App. 318, 435 S.E.2d 565, 569 (1993), *rev'd on other grounds*, 338 N.C. 293, 449 S.E.2d 459 (1994).

Although parol evidence is admissible in the present case to determine the parties' intentions with respect to the prepayment penalties, the court finds such evidence relatively fruitless in this case because the question of whether the premiums would be enforced post-confirmation is a contingency that was never addressed or anticipated by any party during the development of the Debtor's Plan.[6] This notwithstanding, the court does believe that the general tenor of the documents, combined with the situation of the parties at the time, tend to establish that the Plan was not intended to require the Debtor (or the Frenches) to pay the prepayment penalties in the event the debt to MassMutual was satisfied prior to the new maturity date of November 1, 2001.[7]

In concluding that the prepayment penalties are unenforceable in this case, the court is highly swayed by those provisions in the Plan reinstating the parties contractual obligations as those obligations existed immediately preceding the filing of the bankruptcy petition and limiting MassMutual's security interest in the Debtor's property to the same extent as MassMutual's secured status on the petition date. As even MassMutual concedes, immediately prior to the bankruptcy filing MassMutual had no right to collect the prepayment premiums. Once the original maturity dates of the Notes passed, prepayment was no longer an option. And while the provisions calling for the prepayment penalties physically remained a part of the loan documents, the rights created by those provisions vanished. Thus, the practical effect of Plan provision retaining all terms of the original loan documents unless expressly modified, at least so far as the prepayment premiums are concerned, is to retain a right which no longer exists. While MassMutual could certainly have "revived" the prepayment penalties by insisting that the Plan expressly provide for such, as it stands, the Plan contains no such language. Accordingly, once the Plan was confirmed, and the loans renewed, the Debtor enjoyed an absolute right to prepay its indebtedness to MassMutual without being compelled to also pay the burdensome prepayment penalties.[8]

---

5. Under North Carolina law "[a]n ambiguity exists where, in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions asserted by the parties." *Maddox v. Colonial Life & Acc. Ins. Co.*, 303 N.C. 648, 280 S.E.2d 907, 908 (1981).

6. While none of the parties considered the issue of the prepayment penalties during the development of the Debtor's Plan, Mr. Doyle testified that had he or the Frenches understood that MassMutual would seek to collect those premiums post-confirmation, the Frenches would never have assented to the confirmation the Debtor's Plan.

7. *See Pike v. Wachovia Bank & Trust Co.*, 161 S.E.2d at 462 (The intentions of the parties to a contract is ascertained by "the subject matter of the contract, the language used, the purpose sought, and the situation of the parties at the time.").

8. Although the passage of the original maturity date extinguished MassMutual's right to collect the prepayment penalties, the same does not hold

Further bolstering the court's opinion that the prepayment penalties are unenforceable in this case is the fact that the penalty delineated in the Third Note cannot be calculated as written. Under its own terms, the prepayment premium in the Third Note is a function of the yield of a certain U.S. Treasury Note maturing on February 15, 1993. Because the Treasury Note referenced in the Third Note has already matured, the prepayment premium cannot be calculated. In order to cure this anomaly, MassMutual suggests that it would be logical to substitute the yield on a Treasury Note maturing in November 2001 for the yield expressly called for in the prepayment provision. The obvious flaw with this position is that it flies in the face of MassMutual's central argument in this case that under the dictates of the Plan, the terms and conditions of the loan documents cannot be altered unless expressly modified by the Plan. MassMutual cannot have it both ways.

Additionally, as to the Third Note, the court finds it quite compelling that MassMutual and the Debtor executed a Modification and Estoppel Agreement which specifically references and modifies the two numbered paragraphs prior to and on the same page as the prepayment provision but does not modify the prepayment provision. If the parties did truly intend to extend the rights and obligations delineated in that provision to the parties' post-confirmation obligations, the court feels certain that the Modification and Estoppel Agreement would have modified the provision's terms so as to provide for a calculable penalty.

Lastly, in determining that the prepayment premiums are unenforceable in this case the court is also swayed by the fact that inasmuch as MassMutual received its bargained-for interest rate for the entire terms of the original loans, the underlying purpose for the prepayment penalties had been fulfilled. As MassMutual states in its Motion,

"the traditional function of prepayment clauses is to ensure that the lender receives 'the contractual rate of return for the life of the loan, or the equivalent thereof.'" (MassMutual's Motion for Determination of Allowed Amount of Senior, Secured Debt p. 9. [quoting *In re Kroh Brothers Development Co.*, 88 B.R. 997, 1000 (Bankr.W.D.Mo.1988) ] ). In the present case the prepayment premiums served their purpose; the Debtor did not refinance during the original terms of the Notes and MassMutual enjoyed and received healthy interest rates for those entire periods.[9] Having already received the benefit of its bargain, MassMutual should not be allowed to reap those benefits once again without negotiating for and securing those rights as part of its claim treatment under the Plan.

 As a last housekeeping matter, there is the issue of $263 in late charges sought by MassMutual, but objected to by the Debtor and the Frenches. Other than a perfunctory request for the $263 fee in its Motion and a brief mention of the fee at the hearing in this matter, MassMutual has presented no evidence whatsoever establishing its entitlement to that fee. Because MassMutual has failed to carry its burden of proof with regard to the $263 late charge,[10] that fee will not be allowed as a secured or unsecured claim in this bankruptcy.

FOR THE REASONS STATED HEREIN, THE COURT ORDERS that the prepayment provisions contained in the First, Second and Third Notes are unenforceable against both the Debtor and the Frenches, and MassMutual is not entitled to any payment whatever under those provisions. It is further ORDERED that MassMutual is not entitled to collect the $263 late charge as part of its claim in this bankruptcy.

---

true with regard to the Debtor's right to prepay. While it is true that the Debtor's right to prepay was initially governed by the terms of the three Notes, once the original maturity date of those Notes passed and the rights created by the prepayment provisions vanished, N.C.Gen.Stat. § 24–2.4 stepped in to fill the void and grant the Debtor an unconditional right to prepay the Notes prior to their November, 2001 due date.

9. MassMutual received 9.25% for fifteen years on the First Note; 10.125% for thirteen and one-half years on the Second Note; and 14.4% for eight years on the Third Note.

10. A secured creditor has the burden of proof as to its entitlement to fees and costs under 11 U.S.C. § 506(b). *In re Gwyn*, 150 B.R. 150, 154 (Bankr.M.D.N.C.1993).