**FOOTHILL CAPITAL
CORPORATION, Plaintiff–Appellant,**

v.

**OFFICIAL UNSECURED CREDITORS'
COMMITTEE OF MIDCOM COM-
MUNICATIONS, INC., Defendant–Appellee.**

No. 99–CV–71661.

United States District Court,
E.D. Michigan,
Southern Division.

March 10, 2000.

Seth D. Gould, Detroit, Michigan, Randall L. Klein, Gerald F. Munitz, Chicago, Illinois, for plaintiff.

Kenneth E. Noble, Lawrence K. Snider, Chicago, Illinois, Jonathan S. Green, Detroit, Michigan, for defendant.

*OPINION*

COOK, District Judge.

The parties in this bankruptcy appeal essentially dispute whether it was proper for the Appellant, Foothill Capital Corporation ("Foothill"), to receive a prioritized payment of a monetary premium from the debtor, Midcom Communications, Inc. ("Midcom"), under the terms of a pre-bankruptcy financing agreement between these two companies. The Appellees, the Official Unsecured Creditors' Committee of Midcom Communications, Inc. ("Committee"), have sought and subsequently obtained an order from the United States Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court"), which compels Foothill to return the premium to Midcom. It is uncontroverted that the premium was payable if and when the financing contract was actually terminated.

This appeal presents two issues that appear to be ones of first impression in this jurisdiction. First, the Court has been asked to determine whether, as a matter of law, a debtor terminates a pre-petition contract for a line of credit when it requests relief under Chapter 11 of the United States Bankruptcy Code ("Code") since 11 U.S.C. § 365(c)(2) prohibits the debtor in possession or trustee from assuming the contract. Parenthetically, a question has also arisen as to whether, as a matter of fact, the contract was terminated by opera-tion of certain contractual terms. Second, it has been argued that Foothill's right to receive the premium was accelerated, as a matter of law, as an allowable contingent claim under 11 U.S.C. § 504(a) or an allowable charge under 11 U.S.C. § 504(b).

I

In early 1997, Foothill entered into a contract to provide a revolving line of credit of thirty million dollars ($30,000,000.00) to Midcom for a term of three years with the option to renew. (R. 16 Ex. A., ¶¶ 1.1, 2.1, at 15–16, 23.) By the terms of the contract, Midcom's commencement of a bankruptcy case constituted an "Event of Default." (R. 16 Ex. A, ¶ 8.5, at 54.) Moreover, if a default led to a "termination" of the contract at any time before February 27, 2000, Foothill was entitled to recover a premium for the premature act of termination ("early termination premium"), which was to be calculated according to a specified formula.[1]

On November 7, 1997, Midcom filed a voluntary petition for relief under Chapter 11 of the Code and thereby defaulted on the contract. Even so, with the approval of the Bankruptcy Court, Foothill chose to provide post-petition financing to Midcom. The ostensible purpose of such lending was to help Midcom continue its operations until it could finalize arrangements to have Winstar Communications, Inc. ("Winstar")

---

1. On the one hand, ¶ 3.6 of the contract allows Midcom to terminate the agreement, upon 90 days' written notice to Foothill, by paying the early termination premium in cash. (R. 16 Ex. A, at 33–34.) On the other hand, ¶ 9.1 provides that, after an event of default, Foothill can elect, "without notice of its election and without demand, ... [to] Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Foothill, but without affecting Foothill's rights and Liens ... and without affecting the Obligations...." (R. 16 Ex. A, at 56.) Moreover, according to ¶ 3.7,

   If Foothill terminates this Agreement upon the occurrence of an Event of Default, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of Foothill's lost profits as a result thereof, the Borrowers shall pay to Foothill upon the effective date of such termination, a premium in an amount equal to the Early Termination Premium. The Early Termination Premium shall be presumed to be the amount of damages sustained by Foothill as the result of the early termination and the Borrowers agree that it is reasonable under the circumstances currently existing. The Early Termination Premium provided for in this Section 3.7 shall be deemed included in the Obligations.

   Hence, Foothill had the option to terminate the agreement and collect the premium upon the occurrence of an event of default. (R. 16 Ex. A, at 34).

purchase its assets. On January 21, 1998, Midcom sold a substantial portion of its assets to Winstar for approximately ninety million dollars ($90,000,000.00). Of that sum, more than thirty million dollars ($30,-000,000.00), including the early termination premium, was then paid to Foothill.[2]

Thereafter, the Committee asked the Court to order Foothill to return the early termination premium, arguing that payment of the premium was not proper. Ultimately, following the submission of cross-motions for summary judgment, the Bankruptcy Court agreed with the Committee and entered a summary judgment in its favor and against Foothill on the issue. This resulted in a remittance of the premium by Foothill to the Committee, and the instant appeal followed.

## II

Under 28 U.S.C. § 158(a)(3), "[t]he district courts of the United States shall have jurisdiction to hear appeals ... with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." The parties have deemed the order from the Bankruptcy Court, which grants a partial summary judgment, to be non-final, and Foothill requested leave to appeal. On August 23, 1999, this Court issued an Order, wherein it found sufficient cause to allow the interlocutory appeal. Thus, jurisdiction obtains under § 158.

**2.** "The [early termination premium] ... is a pre-petition claim arising out of a pre-petition agreement." (Appellant's Br. at 11.)

**3.** Importantly, the Court examines any pleadings and evidence in the light most favorable to the nonmoving party. Fed.R.Civ.P. 56(c); see *Eastman Kodak Co. v. Image Tech. Svcs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). Here, cross-motions for summary judgment were filed, and the Bankruptcy Court elected to grant the Committee's motion while denying that of

## III

■ Since this appeal comes on the heels of the entry of a summary judgment, conclusions of law by the Bankruptcy Court will be subject to *de novo* review, while disputed findings of fact will be set aside only if they are clearly erroneous. *See Unsecured Creditors' Comm. of Highland Superstores, Inc. v. Strobeck Real Estate, Inc. (In re Highland Superstores, Inc.),* 154 F.3d 573, 576 (6th Cir.1998) (legal conclusions receive new review); *Rosinski v. Boyd (In re Rosinski),* 759 F.2d 539, 541 (6th Cir.1985) (disputed factual determinations are examined for clear error). Otherwise, the familiar standards that pertain to motions for summary judgment apply. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[3]

## IV

Foothill contends that it should have collected the early termination premium as a secured claim that was prioritized over the unsecured claims of the Committee's members. However, under the contract, the premium was to issue only when the agreement was terminated. Hence, the Bankruptcy Court correctly observed that "[t]he threshold question then is whether the loan agreement was terminated as of the petition date." (R. 18 at 5.)

Foothill first argues that Midcom's act of filing for reorganization invoked 11 U.S.C. § 365(c)(2), which operates to prevent a debtor in possession[4] from assum-

Foothill. Hence, when this Court reviews the entry of a summary judgment in favor of the Committee, it will evaluate the submitted materials in the light that is most favorable to Foothill. On the other hand, in considering the propriety of denying Foothill's motion, the Court will examine the record in a light that is favorable to the Committee.

**4.** "A debtor in possession has the rights, and is subject to the limitations, of a trustee." Lawrence P. King, et al., 3 *Collier on Bankruptcy* § 365.06[1][d], at 365–58 (15th

ing the loan contract here. It is contended that this prohibition was equivalent to an immediate termination of the loan agreement as a matter of law. Hence, Foothill's contractual right to the early termination premium matured when the petition was filed. In response, the Committee asserts that § 365(c)(2) does not terminate a debtor's prior contracts, but only "precludes a debtor from forcing a lender to provide postpetition financing." (Appellee's Br. at 4.) Hence, it is argued that Midcom's act of filing for reorganization was not a termination, and Foothill's claim for the premium did not mature.

■ According to the terms of § 365(c)(2), a "trustee [in bankruptcy] may not [5] assume or assign any executory contract [6] ... of the debtor ... if ... such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor...." The clear implication of this section is that a nondebtor may not be required (by way of contractual assumption) to make new, additional extensions of credit to a debtor that has become insolvent.[7] *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 348, *reprinted in* 1978

U.S.C.C.A.N. 5963, 6304 (1978) ("The purpose of [§ 365(c)(2) ], at least in part, is to prevent the trustee from requiring new advances of money or other property. The section permits the trustee to continue to use and pay for property already advanced, but is not designed to permit the trusee [sic] to demand new loans or additional transfers of property under lease commitments.").

The United States Court of Appeals for the Sixth Circuit (Sixth Circuit), in recognizing this principle, stated that "[§] 365(c)(2) is designed 'to protect a party to a contract from being forced to extend cash or a line of credit to one who is a debtor under the Bankruptcy Code.' Thus, the trustee 'may not force a creditor into the untenable position of having to extend straight cash to an insolvent debtor.' " *Tully Constr. Co. v. Cannonsburg Envtl. Assocs. (In re Cannonsburg Envtl. Assocs.),* 72 F.3d 1260, 1266 (6th Cir.1996) (discussing the inapplicability of § 365(c)(2) to post-petition financing contracts) (quoting 1 Collier Bankruptcy Manual ¶ 365.02[2], at 14–15 (3d ed.1995)).[8] This governing authority tends to counsel that, as a matter of law, a debtor cannot

---

ed.1999). It is undisputed that Midcom is such a debtor.

**5.** The phrase " 'may not' is prohibitive, and not permissive." 11 U.S.C. § 102(4).

**6.** An executory contract under the Bankruptcy Code is "[a] contract under which [the] debtor and [the] nondebtor each have unperformed obligations and the debtor, if it ceased further performance, would have no right to the other party's continued performance." *Black's Law Dictionary* 321 (7th ed.1999). The parties agree that the loan contract here is an executory one.

**7.** "A plain reading of this section indicates that executory contracts to make a loan or extend other debt financing or financial accommodations are not assumable. The legislative history of this section indicates § 365(c)(2) was intended to be limited to actual extension of cash or a line of credit...." *Airlines Reporting Corp. v. Charrington World-*

*wide Enter. (In re Charrington Worldwide Enter.),* 110 B.R. 973, 975 (M.D.Fla.1990).

**8.** *See also In re Best Prods. Co.,* 210 B.R. 714, 718 (Bkrtcy.E.D.Va.1997) ("The purpose of §§ 365(c)(2) and (e)(2)(B) is quite simple—to prevent a debtor's financial uncertainty, which necessarily results when a bankruptcy petition is filed, from unfairly elevating the risk to a party who extended credit pre-petition."); *John Deere Co. v. Cole Bros. (In re Cole Bros.),* 154 B.R. 689, 691 (W.D.Mich. 1992) ("The rationale of this subsection is that when 'the debtor files a bankruptcy petition, another party's contractual commitment to extend new credit to the debtor in the future may be unfairly onerous to that party.' ") (quoting Benjamin Weintraub & Alan N. Resnick, Bankruptcy Law Manual § 7.10[3], at 7-101 (4th ed.1996)); *In re Charrington Worldwide Enter.,* 110 B.R. 973, 975 (M.D.Fla.1990) ("The purpose of § 365(c)(2) is to protect a party who has made an unperformed lending commitment.") (citing *In re Travel Shoppe, Inc.,* 88 B.R. 466 (Bankr.N.D.Ga.1988)).

assume a contract that grants it a revolving line of credit because such contracts leave the creditor exposed to demands by the debtor for additional advances of money.[9] If this standard is not applied, pre-petition creditors could be legally obligated to forward sums of money to a debtor whose creditworthiness had substantially changed.

In the instant appeal, the loan contract created a thirty-million-dollar line of credit for Midcom. In the absence of the specific provisions of § 365(c)(2), Foothill would have a legitimate concern that the debtor could demand an additional loan under the pre-petition contract.[10] This is precisely the circumstance that § 365 was designed to prevent. Hence, Foothill correctly contends that the loan contract is not assumable as a result of the operation of the statute. Moreover, under the Code, each claim against a debtor is ordinarily assumed or rejected.[11] *See generally NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 552, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("[A]lthough Chapter 11 permits a debtor in possession to accept or reject a contract 'at any time before the confirmation of the plan,' the nondebtor party to such a contract is permitted to request that the Court order the debtor in possession to assume or reject the contract within a specified period.") (quoting 11 U.S.C. § 365(d)(2)).

■■■ Foothill maintains that since the loan contract is not assumable, its rejection is inevitable. However, even if the Court accepted Foothill's argument, termination has not necessarily occurred in this case,[12] and Foothill's right to collect the

9. *See also Huntington Nat'l Bank v. Alix (In re Cardinal Indus.)*, 146 B.R. 720, 731 (Bkrtcy. S.D.Ohio 1992) (contract to extend line of credit to debtor was executory and not assumable because of § 365(c)(2) where primary purpose of contract was to enhance liquidity of certain certificates issued by debtor).

The opinions of leading scholars are consistent with this conclusion. In one treatise, it is noted that the "essence [of § 365(c)(2) is that] a contracting party may not be required to extend new credit to the debtor after the commencement of the case." Benjamin Weintraub & Alan N. Resnick, *Bankruptcy Law Manual* § 7.10[3], at 7–88 (4th ed.1996); *see also* William L. Norton, Jr., 2 *Norton Bankruptcy Law and Practice 2d* § 39:19, at 39–66–39–67 (1999) (§ 365(c)(2) "fully protects the third party lender suddenly faced with a credit agreement involving a debtor in bankruptcy, where the initial agreement was based at least in part on the financial strength of the debtor.").

10. As of the filing date, "the principal amount of Prepetition Debt was approximately $21,800,000...." (R. 11 Ex. C, at 6.) Hence, it appears that, absent § 365(c)(2), Midcom could assume the loan contract and demand upwards of $8,000,000.

11. Without ruling on the issue, this Court notes that the Bankruptcy Court has stated, and neither party has cited any authority to the contrary, that despite the unassumability of the contract, "[t]he parties remain free to continue the lending arrangement post-petition, but subject to the safeguards of § 364."

(R. 18, at 10.) Hence, it appears that rejection is not the only option aside from assumption. Instead, a modification pursuant to 11 U.S.C. § 364 might be appropriate. According to the Bankruptcy Court, such a modification is exactly what happened here. (R. 18, at 11–12 (citing R. 11 Ex. C, at 15).)

12. Importantly, the Code distinguishes between the filing for bankruptcy, the filing for rejection, and the act of rejection itself. *See generally* Weintraub & Resnick, *supra*, § 7.10[5], at 7–92 (discussing rights of lessors who are contractually bound to provide services during time period between lessee's filing for bankruptcy and its assumption or rejection of contract). Similarly, a nonassumable contract is not, *ipso facto*, a terminated one under the Code. *See* 2 Norton, *supra*, § 39:17, at 39–59 ("In the case of executory contracts not terminated prepetition, a nondebtor party to a nonassumable contract may wish to terminate the contract postpetition. In most cases, the automatic stay operates to prohibit any action to terminate an executory contract or unexpired lease. The nondebtor party to a nonassumable contract, however, may be able to terminate the contract unilaterally without concern for the automatic stay but this right is far from settled."); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection'*, 59 U.Colo.L.Rev. 845, 848 (1988) ("[R]ejection is not the revocation or repudiation or cancellation of a contract or lease, nor does it affect contract or lease liabilities. It is simply a bankruptcy estate's decision

premium only matures when termination occurs. *See* William L. Norton, Jr., 2 *Norton Bankruptcy Law & Practice 2d* § 39:7, at 39–24 (1999) (commenting on the "mistaken belief that rejection of a contract terminates liability under it.") (quoting *First Sec. Bank of Utah, N.A. v. Gillman*, 158 B.R. 498, 504 (D.Utah 1993)). On this point, the Bankruptcy Court correctly cited *Blue Barn Assocs. v. Picnic 'N Chicken, Inc. (In re Picnic 'N Chicken, Inc.)*, 58 B.R. 523, 525 (Bankr.S.D.Cal.1986), as holding that, under California law (which likewise governs here because of a choice-of-law provision in the loan contract), a rejection of a lease does not amount to its termination. Rather, rejection constitutes a breach, 11 U.S.C. § 365(g),[13] which is treated differently from a termination in California. *Id.* (citing *California Safety Ctr., Inc. v. Jax Car Sales of Cal., Inc.*, 164 Cal.App.3d 992, 211 Cal.Rptr. 39 (1985)). By analogy, the Bankruptcy Court held that the rejection of a loan contract does not, without more, terminate the agreement.

The parties have not presented, and this Court has not found, any authority that would mandate a different result for the loan contract here. Accordingly, the Court affirms the decision of the Bankruptcy Court that (1) the loan contract at issue was not terminated because of § 365(c)(2) as a matter of federal or California law, and (2) Foothill is not entitled to the early termination premium.

not to assume, because the contract or lease does not represent a favorable or appropriate investment of the estate's resources. Rejection does not change the substantive rights of the parties to the contract or lease, but merely means that the bankruptcy estate itself will not become a party to it.").

Under the provisions of the Code, inevitable rejection need not be equivalent to an actual rejection and is certainly not the same as a termination. In order to prevail here, Foothill would be obliged to present evidence that the contract had actually been terminated. The record, however, does not contain such evidence.

## V

■ Foothill next contends that, under the terms of the parties' agreement, it was entitled to terminate the contract without making any outward act of termination when Midcom defaulted on its obligations by filing for bankruptcy.[14] The Committee acknowledges that the act of filing constituted a default that gave Foothill the right to terminate the contract. Nevertheless, it is undisputed that no explicit, outward act of termination ever occurred. According to the Committee, Foothill's failure to affirmatively evince a termination undermines its right to receive the premium.

■ After reviewing these arguments, the Bankruptcy Court held that Foothill did not have the right to silently terminate the contract and concluded that some express action was required. (R. 18, at 9.) As noted in its opinion, "a contract must be interpreted [under the California Civil Code] so as to give effect to the 'mutual intention' of the parties as it existed at the time of contracting." *Mission Valley East, Inc. v. County of Kern*, 120 Cal. App.3d 89, 174 Cal.Rptr. 300, 305 (1981) (interpreting Cal. Civil Code § 1636). In order to discern that intent, courts look to the objective evidence as revealed in the contract, rather than to the parties mere assertions about their subjective intent. *See id.; Golden West Baseball Co. v. City of Anaheim*, 25 Cal.App.4th 11, 21, 31 Cal. Rptr.2d 378 (1994) ("The precise meaning of any contract, including a lease, depends upon the parties' expressed intent using an

**13.** "Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition...." 11 U.S.C. § 365(g)(1).

**14.** For a recitation of paragraph 9.1, upon which Foothill has relied in asserting this claim, see footnote 1.

objective standard. When there is ambiguity in the contract language, extrinsic evidence may be considered to ascertain a meaning to which the instrument's language is reasonably susceptible.") (citations omitted), *quoted in Qualls v. Lake Berryessa Enters., Inc.*, 76 Cal.App.4th 1277, 91 Cal.Rptr.2d 143, 147 (1999). "Where contract language is clear and explicit and does not lead to absurd results, [the court will] ascertain intent from the written terms and go no further." *Shaw v. Regents of the Univ. of Cal.*, 58 Cal. App.4th 44, 67 Cal.Rptr.2d 850, 855 (1997) (quoting *Ticor Title Ins. Co. v. Employers Ins. of Wausau*, 40 Cal.App.4th 1699, 1707, 48 Cal.Rptr.2d 368 (1995)).

In applying this law, the Bankruptcy Court correctly noted that the terms of the challenged loan contract suggest that some affirmative act was required to trigger a termination thereof. Loan contracts fall into a slim category under § 365(e)(2)(B) whereby parties can expressly provide that the act of filing for bankruptcy will trigger the termination of their agreement. Although the parties to the contract in this case are sophisticated corporations, they did not include such a provision in their contract. (R. 18, at 7.) Foothill had the right to terminate their agreement under ¶¶ 3.7 and 9.1, but it also had the option to continue the agreement. (R. 18, at 8.) Moreover, if this Court accepts Foothill's interpretation, the provision in the contract that gives the lender the right to terminate the contract "without notice of its election and without demand" (to wit, ¶ 9.1), would produce an absurd result;

namely, that the contract could be terminated in the creditor's own mind before anyone else knew about it. (R. 18, at 8.) When evaluated collectively, these factors weigh in favor of a finding that ¶ 9.1 of the contract did not, and does not, authorize the termination of the parties' contract amid silence. Therefore, on this point, the decision of the Bankruptcy Court is affirmed.

■ Foothill also contends that its notice of termination effectively occurred when Midcom and Foothill voluntarily became subject to the order of the Bankruptcy Court, which governed post-petition debt arrangements. At that point, further notice of termination became useless because both parties to the contract recognized that the pre-petition agreement was "a dead letter." (Reply Br. at 5.) Moreover, according to Foothill, notice is not required when it would be of no use to the notified party. *See* 66 C.J.S. *Notice* §§ 17, 21.

A close reading of the post-petition financing order by the Bankruptcy Court, however, reveals that the agreement to provide financial accommodations to Midcom was a modification, or a modified extension, of the pre-petition agreement (within the bounds of 11 U.S.C. § 364) rather than a termination thereof.[15] Essentially, Midcom was allowed to draw the entirety of its remaining line of credit, but only subject to the safeguards of § 364. As such, an entry of the financing order was not tantamount to a notice of termination.[16] Hence, the Bankruptcy Court

---

**15.** This appears to be the reading that the Bankruptcy Court gave to its order. *See* footnote 11.

**16.** In reply, Foothill asserts that no such modification occurred. Instead, it argues that the pre-petition contract was terminated, and a post-petition agreement was consummated. Specifically, it is the Appellant's position that when, in the financing order, the court and parties incorporated the terms of the pre-petition contract into the post-petition agreement by reference, they merely employed a convenient gap-filling device, so that they

would not need to rewrite an entire contract. The plain terms of the order, however, reveal that

[e]xcept as modified herein (including that Event of Default shall be as defined herein, except with respect to the Debtors' obligation to pay interest hereunder at the Default Rate) and subject to other provisions of this Order and the Code, the Prepetition Documents shall remain in full force and effect with respect to both the Prepetition Debt and the Postpetition Debt. To the Extent there exists any conflict between the

**304**

was correct in concluding that (1) the contract did not entitle Foothill to engage in silent termination of the contract and (2) Foothill did not otherwise provide adequate notice of termination.[17] Accordingly, this Court affirms the conclusion by the Bankruptcy Court that Foothill did not properly exercise its option to terminate the contract.

## VI

Foothill has also advanced an argument that, even if termination did not occur under either § 365(c)(2) or the terms of the contract, it is entitled to the payment of the early termination premium as a

contingent secured claim or a secured charge under 11 U.S.C. § 506(a), (b).

## A

■ Foothill asserts that its right to the early termination premium was a contingent claim under the Code.[18] Moreover, 11 U.S.C. § 502(b) provides that claims (including contingent ones) shall be allowed so long as any "objection [thereto] is made, [and] the court, after notice and a hearing, ... determine[s] the amount of such claim in lawful currency of the United States as of the date of the filing of the petition...."[19] Finally, § 506(a)[20] would

---

Motion, the Prepetition Documents and the terms of this Order, this Order shall govern and control.
(R. 11, Ex. C ¶ 7(b), at 15.) The Bankruptcy Court interpreted its order, which superceded any arguments or documents to the contrary, as modifying the prepetition contract to allow for the protected extension of additional postpetition credit to Midcom. (R. 18 at 12.) This Court does not find error in that interpretation.

17. Foothill has also cited *In re Watts*, 876 F.2d 1090 (3d Cir.1989), for the proposition that it would be anomalous to require notice of termination of a loan contract after a bankruptcy case has been filed because of the automatic stay that results therefrom. However, this is not a complete and accurate statement of the principle in *Watts*.

There, the state government enacted a program to pay certain housing benefits to persons who were subject to impending mortgage foreclosures, provided that no other legal relief was available. However, the filing of a bankruptcy case created alternative legal relief to forestall foreclosure, on account of the automatic stay that applies to foreclosure proceedings. Thus, a petition for relief triggered a termination, or at least a suspension, of the benefits under the terms of the agreement. *See id.* at 1091.

In assessing these circumstances, the court found that the benefit program offered the kind of financial accommodations that are unassumable pursuant to § 365(c)(2). *See id.* at 1095. Moreover, § 365(e)(2)(B) expressly provides that automatic termination provisions are permissible in connection with loan contracts. Following these observations, the *Watts* court stated that where a loan contract provides for automatic termination of a contract upon the filing of a bankruptcy petition,

it would be anomalous to hold that the termination was stayed during the course of the bankruptcy proceedings. *See id.* at 1096.

By contrast here, the contract did not contain any such automatic termination provision, even though both parties were sophisticated and presumably aware of the availability of relief under § 365(e)(2)(B). Rather, they differentiated between default and termination and agreed that a filing for bankruptcy would only constitute a default. Accordingly, there is nothing anomalous about requiring a party, who has refrained from agreeing to automatically terminate a loan contract in the event of a bankruptcy, to provide a post-filing notice of termination.

18. Under 11 U.S.C. § 101(5)(A) a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...."

19. According to 11 U.S.C. § 502(g), when a contingent claim "aris[es] from the rejection, under section 365 of this title or under a plan under [Chapter 11], of an executory contract ... of the debtor[, the claim] shall be allowed ... or disallowed ... the same as if such claim had arisen before the date of the filing of the petition." Therefore, to the extent that the approval by the Bankruptcy Court of the sale of Midcom's assets to Winstar triggered a rejection of the pre-petition loan, such rejection is treated as a pre-petition one. Nonetheless, as discussed above, rejection is not necessarily termination.

20. "An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of

operate to render the contingent claim here to be a secured one. By these provisions, Foothill contends that its claim for the premium is an allowable, contingent secured claim. Hence, it submits that the payment of the premium was proper.

■ This argument fails for two reasons. First, it is not entirely clear that Foothill has a contingent claim. Once the time for the contingency passes, and the contingency does not occur, the creditor can no longer assert a contingent claim. *Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court, N.Y., N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 951 (2d Cir.1996) ("Contingent claims are designed to include claims that may reasonably occur in the future, not claims that could have occurred but in fact did not and cannot now occur.").[21] Accordingly, to the extent that (1) Foothill argues that the purchase of the assets by Winstar closed the possibility of any later termination,[22] and (2) the Court

has concluded that such a sale did not cause a termination, the Appellant does not have a contingent claim for the premium.

Second, even if its claim is contingent under the Code, the Appellant must prove the claim, along with a reasonable estimation of its value, at a hearing in the Bankruptcy Court before payment can issue. *See* 11 U.S.C. § 502. On the present record, there is no evidence that any such hearing ever occurred. Foothill has not established that it had the right to such an early, prioritized payment. Accordingly, this Court affirms the ruling by the Bankruptcy Court that Foothill was not yet entitled to receive the early termination premium under 11 U.S.C. § 506(a).[23]

**B**

■ Finally, Foothill contends that the early termination premium is an allowable charge under 11 U.S.C. § 506(b).[24] Inter-

the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a).

**21.** In *In re Chateaugay Corp.*, a Chapter 11 debtor contracted with Aetna Casualty and Surety Company ("Aetna") to ensure payment of certain workers' compensation obligations in the event that the debtor was temporarily unable to do so. *See id.* at 945. Had Aetna not paid the particular claims at issue, the states would have been required to pay them and could have asserted prioritized claims for excise taxes under 11 U.S.C. § 507(a)(8)(E). *See id.* at 951. Aetna argued that its claim should receive the same priority by way of subrogation. The lynchpin in this argument was the assertion that the states had contingent claims against the debtor because Aetna's default would trigger the states' liability. *See id.*

In a well reasoned opinion, the United States Court of Appeals for the Second Circuit rejected this argument and stated, "Aetna's

claim is not a contingency; it is a nullity." *Id.* Although Aetna could have defaulted on its obligation and thereby created a liability for the states, it did not do so. Moreover, the time for defaulting had passed. These circumstances led the court to state, "[d]ifficulties have arisen in interpreting § 101(5)(A) with regard to 'unmatured' claims, but not with regard to *unmaturable* claims.... Aetna's default on payments it already made can never occur, so the bonded states do not have a contingent or unmatured claim to which Aetna can subrogate itself." *Id.* In summary, where a contingency cannot occur (despite whether it could have transpired at an earlier time), a contingent claim will not lie.

**22.** Reply Br. at 7 ("[T]he sale [of Midcom's assets to Winstar] and payment [of money to Foothill] ... removed the contingency that precluded the [premium] from first arising on the petition date....").

**23.** The Court expresses no opinion as to whether, following some later hearing, a payment of the premium would be proper.

**24.** "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim,

estingly, in its initial brief wherein it asked the Bankruptcy Court to enter a summary judgment in its favor, Foothill appears to have taken a contrary position.[25] Since the Bankruptcy Court did not have the opportunity to address the Appellant's present arguments, no affirmance or reversal on the matter can issue.

Nonetheless, this Court is not precluded from addressing this legal question. There is little doubt that the premium had the potential to be a charge, which would payable under § 506(b) if it were reasonable. *See, e.g., Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Assoc. (In re Imperial Coronado Partners, Ltd.),* 96 B.R. 997, 1000–01 (9th Cir. BAP 1989) (early prepayment premium); *In re Carr Mill Mall Ltd. Partnership,* 201 B.R. 415, 420 (Bankr.M.D.N.C.1996) (same); *In re Duralite Truck Body & Container Corp.,* 153 B.R. 708, 731–15 (Bankr.D.Md. 1993) (same); 2 Norton, *supra,* § 43:3, at 43–11–43–12 ("Such charges were generally believed to be intended to include prepayment charges and late charges authorized under the agreement."). However, in order to have been actually payable under the terms of the agreement, termination must have occurred. Here, as discussed earlier, no such termination took place. Accordingly, the charge has not matured, and its payment, even as a charge, was not proper.[26]

---

and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b).

**25.** There, Foothill stated,

The Committee, as do many of the published opinions which have examined this issue, mistakenly treats the [early termination premium] as a "charge" which must be evaluated under § 506(b). This assumption relies upon the faulty premise that the [premium] became due post-petition. This is

## VII

For the reasons set forth above, the Court affirms the decision by the Bankruptcy Court that neither 11 U.S.C. § 365 nor the terms of the loan contract here precipitated a termination of the contract as a matter of law. Moreover, on the present record and briefs, Foothill has not met its burden to show that its claim was contingent and payable under 11 U.S.C. § 506(a), and the conclusion reached by the Bankruptcy Court is affirmed on that issue. Finally, the premium is not a mature charge under 11 U.S.C. § 506(b), and the Appellant's request for relief on the basis of that subsection is denied.

IT IS SO ORDERED.

---

wrong—the [premium], as a portion of Foothill's accelerated debt, is a pre-petition claim, which is consistent with the fact that damages are fundamentally a claim, not a charge.
(R. 15, at 10–11.) Now, the Appellant maintains that "[t]he [early termination premium] is a charge provided for under the Pre-Petition Loan Agreement between the parties." (Br. at 15.)

**26.** As such, it is unnecessary to reach the issue whether the charge was a reasonable one.